IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

STEPHEN DOUGLAS BARRON,   )
           )
  Plaintiff,    )
           )
v.            )
           ) No. 09-CV-02733 Ma/P
PGA TOUR, INC.,     )
           )
  Defendant.    )
           )
           )

---

ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

---

On Thursday, November 12, 2009, plaintiff Stephen Douglas Barron ("Doug Barron" or "Barron") filed a Verified Complaint for Monetary Damages and Injunctive Relief in the Chancery Court of Tennessee for the Thirteenth Judicial District, in Memphis, Tennessee. In his complaint, Barron seeks, among other relief, a temporary restraining order requiring defendant PGA Tour, Inc. ("PGA Tour") to allow him to compete in the Second Qualifying Stage of the PGA Tour Qualifying Tournament, which begins on Wednesday, November 18, 2009, at the Deerwood Golf Club in Kingwood, Texas, with practice rounds beginning on Monday, November 16. A hearing on Barron's motion for a temporary restraining order was scheduled to take place at 2:00 p.m. on November 12 before the Chancery

Court.[1]  However, the PGA Tour filed a Notice of Removal on the afternoon of November 12, removing the case to the United States District Court for the Western District of Tennessee.  The parties later approached the District Judge assigned to the case, stated that they consented to have the Magistrate Judge preside over and decide the motion, and requested an expedited hearing.  The parties' request was granted and a hearing on the motion was scheduled for Friday, November 13, at 9:00 a.m., before the undersigned Magistrate Judge.[2]  At the conclusion of the hearing, the court took the motion under advisement.

The court, having now considered the arguments of counsel and the entire record in this case, denies the motion for a temporary restraining order.

## I. FINDINGS OF FACT

The following facts are based predominantly on the verified

---

[1] After filing the complaint, Barron notified the PGA Tour about the injunction hearing in a letter faxed to PGA Tour Commissioner Timothy W. Finchem.

[2] At the beginning of the hearing, the parties again stated that they consented to the Magistrate Judge presiding over and disposing of Barron's motion for a temporary restraining order pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  28 U.S.C. § 636(c) provides that a Magistrate Judge may conduct "any or all proceedings" in a jury or nonjury civil matter with the consent of the parties, which includes "partial" or "limited" consent to have a Magistrate Judge decide dispositive motions within a case, without disposing of the entire case.  See Hains v. Washington, 131 F.3d 1248, 1249 (7th Cir. 1997); Roda Drilling Co. v. Siegal, No. 07-CV-400-GFK-FHM, 2008 WL 4056229, at *1 (N.D. Okla. Aug. 11, 2008); Gilbert v. St. John's Univ., No. 94 CV 1534, 1998 WL 19971, at *1 n.1 (E.D.N.Y. Jan. 20, 1998).

complaint, the affidavit filed by Andrew B. Levinson (Executive Director of the PGA Tour Anti-Doping Program), and exhibits admitted at the hearing.[3]

Doug Barron is a professional golfer who joined the PGA Tour in January of 1995. In 1987, when he was eighteen years old, he was diagnosed with mitral valve prolapse and was prescribed a beta blocker, Propranolol, to treat the condition. Without Propranolol, Barron experiences a racing heartbeat and chest pains. In 2005, Barron was found to have low Testosterone levels and was prescribed monthly doses of exogenous Testosterone in order to maintain his Testosterone level within the normal range. Side effects of low Testosterone can include fatigue, lethargy, loss of sex drive, and a compromised immune system, resulting in an increased incidence of infection.

The PGA Tour, together with corporate sponsors and charitable organizations, organizes golf tournaments through the PGA and Nationwide Tours, and awards prize money to golfers who compete in these tournaments. The PGA Tour establishes rules and policies that govern the conduct of golfers who participate in PGA and Nationwide Tour events. Golfers must pay dues to the PGA Tour and

---

[3]Federal Rule of Civil Procedure 65(b)(1)(A) provides that the court may rely on facts contained in affidavits and verified complaints in deciding whether to issue a temporary restraining order or preliminary injunction. Fed. R. Civ. P. 65(b)(1)(A); see also Jackson v. Overton County Sch. Dist., No. 2:06-0096, 2007 WL 173696, at *5 (M.D. Tenn. Jan. 18, 2007).

agree to abide by the rules and policies established by the PGA Tour in order to participate in PGA Tour events.

In 2008, the PGA Tour promulgated its Anti-Doping Program ("the Program"), and on July 3, 2008, the Program went into effect. The Program was developed in conjunction with the major golf tours and governing bodies around the world and incorporated input from leading experts in the field of anti-doping.  The Program was modeled on the standards of the World Anti-Doping Agency and its Anti-Doping Code.

The Program contains a list of "Prohibited Substances and Methods," and included on this list of banned substances are Propranolol and exogenous Testosterone.  The Program allows players to apply for a Therapeutic Use Exemption ("TUE").  If granted, the TUE allows the player to use the substance despite its status on the list of banned substances.  In order to obtain a TUE, the player must submit an application and supporting medical information.  This information is submitted to a TUE Committee comprised of an independent medical advisor and one or more independent specialists of the medical advisor's choosing with experience in the area relevant to the player's illness or condition.  The TUE Committee reviews the medical information and recommends to the PGA Tour whether to grant a TUE.  Under the Program, a player may obtain a TUE if four criteria are met:

> a.   The player would experience a significant impairment to health if the *Prohibited Substance* or

-4-

*Prohibited Method* were to be withheld in the course of treating an acute or chronic medical condition (the use of any *Prohibited Substance* or *Prohibited Method* to increase "low-normal" levels of any Endogenous hormone is not considered an acceptable therapeutic intervention); and

b.   The therapeutic use of the *Prohibited Substance* or *Prohibited Method* would produce no additional enhancement of performance other than that which might be anticipated by a return to a state of normal health following the treatment of a legitimate medical condition; and

c.   There is no reasonable therapeutic alternative to the use of the otherwise *Prohibited Substance* or *Prohibited Method*; and

d.   The necessity for the use of the otherwise *Prohibited Substance* or *Prohibited Method* is not a consequence, wholly or in part, of a prior non-therapeutic use of any substance on the *PGA Tour Prohibited List*.

Prior to the effective date of the Program, on June 23, 2008, Barron submitted two TUE applications to the PGA Tour. The first application sought an exemption for the use of the beta blocker Propranolol. This application was reviewed by a TUE Committee consisting of a panel of doctors, including cardiologists. The application to use Propranolol was denied by the TUE Committee on October 10, 2008. Barron appealed the decision in accordance with the Program and the appeal was denied by the PGA Tour on October 22, 2008. Barron was instructed by the PGA Tour to begin weaning himself off of Propranolol. After his application was denied, Barron began reducing his dosage of Propranolol under a course of treatment prescribed by his medical doctor. He initially started

-5-

the treatment with 160 milligrams of Propranolol, and by June of 2009, he had reduced his dosage to 40 milligrams.

The second application for a TUE sought an exemption for the use of Testosterone.  This application was reviewed by a TUE Committee consisting of a panel of doctors, including endocrinologists.  At the request of the TUE Committee, Barron was reexamined by an independent endocrinologist.  At the request of the independent endocrinologist, Barron stopped receiving monthly Testosterone injections in October of 2008.  The independent endocrinologist then took Barron's blood samples in November and December of 2008.  The November test indicated Barron's Testosterone level was 325, while the December test indicated that it was 296.  Both of these levels were within the normal range.[4] The TUE Committee denied his application to use Testosterone on January 21, 2009.  Barron did not appeal the TUE Committee's decision.

Barron admits that, in early June of 2009, he received a single dose of exogenous Testosterone from his medical doctor. Barron then played in the St. Jude Classic golf tournament in Memphis, Tennessee, which began on June 8, 2009.  In conjunction with the tournament, he signed a tournament application form,

---

[4]Although the parties have not provided the court with evidence regarding the "normal range" for Testosterone, Barron states in his complaint that the normal range begins at 200, and he concedes that the levels measured in November and December of 2008 fall within the normal range.

confirming his understanding that he was required to abide by the Program. On June 11, 2009, Barron was tested in connection with his play in the tournament. His sample was found to contain evidence of Propranolol and Testosterone. Barron did not dispute the test results and admitted to continued use of both Propranolol and Testosterone. Following the positive tests, Barron provided additional medical information to the PGA Tour on July 23, 2009 and August 12, 2009. The TUE Committees reviewed the additional information provided by Barron and found it insufficient to justify TUEs for the use of Propranolol and Testosterone.

On October 20, 2009, the Commissioner of the PGA Tour, Timothy W. Finchem, provided Barron with a written decision suspending him for one year from participating in PGA Tour or Nationwide Tour competitions and any related activities ("PGA Tour events"), from September 20, 2009 to September 20, 2010. In that letter, Commissioner Finchem wrote as follows:

> On June 23, 2008, you submitted a Therapeutic Use Exemption (TUE) application under the Program requesting that you be allowed to continue to use exogenous Testosterone and Propranolol. At that time, you were given full opportunity to medically justify your use of both substances. Your Therapeutic Use Exemption Application for Propranolol was denied by the PGA TOUR TUE Committee on October 10, 2008. You appealed that decision and your appeal was denied by Commissioner Finchem on October 22, 2008. Your application to use exogenous Testosterone was denied by the PGA TOUR TUE Committee on January 20, 2009. You did not choose to appeal that decision. As of October 23, 2008, you should have begun weaning off of Propranolol. As of January 21, 2009, you should have totally stopped using exogenous Testosterone. The PGA TOUR heard nothing further from

-7-

you in 2009 concerning your use of Propranolol and
exogenous Testosterone. We assumed, consistent with the
denials of your Therapeutic Use Exemption applications,
that your use of these Prohibited Substances had been
discontinued.

On June 11, 2009, you provided a doping control sample.
That sample was found to contain evidence of both
Propranolol and exogenous Testosterone. That laboratory
finding is not contested, since you have subsequently
admitted continuing to use both substances. We invited
you to submit any new medical information that might
mitigate your continued use of these substances in total
disregard of the denial of your TUE applications. You
submitted additional information on July 23, 2009 and
August 12, 2009. The information that you provided was
reviewed by the PGA TOUR TUE Committee and again, no
justification for your use of Propranolol or exogenous
Testosterone was found.

Pursuant to Section H(5) of the Program, Barron could have
appealed the PGA Tour's ruling within seven days of receiving the
notice of sanction. According to the PGA Tour, Commissioner
Finchem told Barron during a telephone call that Barron "was
unlikely to prevail in his appeal" and that "the third-party
hearing officer would not be bound by the sanction imposed and . .
. could impose a more significant sanction as a result of Mr.
Barron's use of two banned substances and as a result of aggravated
circumstances." (Levinson Decl. ¶ 35.) According to Barron, the
Commissioner said "in no uncertain terms that he would be wasting
his time to appeal and that his punishment could be doubled if he
appealed and lost." (Compl. ¶ 34.) Barron did not appeal the
suspension.

Pursuant to Section 2(M) of the Program, the PGA Tour notified

-8-

Barron that it would issue a press release regarding his one-year suspension, and invited Barron to participate in the press release by proposing a statement to be read in conjunction with the PGA Tour's statement.  On October 30, 2009, counsel for Barron sent a letter to Andrew B. Levinson, Executive Director of the Program, stating that Barron wanted the PGA Tour's press release to include the following statement:  "Doug Barron disagrees with the PGA Tour's conclusion that he violated their Anti-Doping policy and the resulting sanction.  All of the medications that were taken by Doug Barron were prescribed by his Medical Doctors for diagnosed medical conditions."  The PGA Tour declined to release Barron's proposed statement, and instead, the following statement was released: "I would like to apologize for any negative perception of the TOUR or its players resulting from my suspension.  I want my fellow TOUR members and the fans to know that I did not intend to gain an unfair competitive advantage or enhance my performance while on TOUR."

As a result of the one-year suspension, Barron filed the present lawsuit.  Barron alleges that the PGA Tour has violated Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189, because he suffers from abnormally low Testosterone, which causes him to have a reduced sex drive, experience fatigue, and have a compromised immune system, and that by refusing to allow him to take exogenous Testosterone and

suspending him for using it, the PGA Tour has discriminated against him based on his disability.  Barron also alleges in his complaint that the Program is an unconscionable contract and therefore is void; that the PGA Tour has breached its duty of good faith and fair dealing by applying the TUE provisions and imposing the sanction against him in an arbitrary and capricious manner; that by issuing a press release that was misleading, the PGA Tour defamed him and placed him in a false light; and that the PGA Tour tortiously interfered with his prospective business endorsement opportunities.

Barron seeks, among other relief, a temporary restraining order requiring the PGA Tour to allow him to compete in the Second Qualifying Stage of the PGA Tour Qualifying Tournament ("Q-School"), which begins on Wednesday, November 18, 2009.  Q-School is an annual three-stage qualifying tournament organized by the PGA Tour in which golfers compete to earn a tour card, which in turn allows golfers to compete in other PGA Tour events the following year.  Without a tour card, golfers who are not among the top money winners on tour cannot compete in PGA Tour events, unless they receive a sponsor exemption or are eligible to compete in "open" qualifying rounds conducted the week before each tournament.[5]  For 2009, golfers who have qualified for the Second Qualifying Stage

---

[5]According to Barron, in 2009 he received only one sponsor exemption, and that was for the St. Jude Classic tournament in Memphis.

competition have been assigned to one of six possible golf course locations in the United States, and play will begin on November 18 and conclude on November 21.  According to the PGA Tour's official website, at the completion of the Second Qualifying Stage, all players tying for the last qualifying position at the conclusion of play at each Second Qualifying Stage site will advance to the Final Qualifying Stage, which is scheduled to begin on December 2, 2009, at Bear Lakes Country Club in West Palm Beach, Florida.  <u>See</u> www.pgatour.com/qschool.  According to the website, the overall field size is 450 players plus ties from the First Qualifying Stage sites and the field size for each of the six Second Qualifying Stage sites will be approximately 78 players.  "The number of players advancing from each site will be on a *pro rata* basis (i.e. roughly the same percentage of players from each site will advance), and such number will be announced during the Second Qualifying Stage."  <u>Id.</u>  In addition, "[a]ll players tying for the last qualifying position at the conclusion of play at each Second Qualifying Stage site will advance to the Final Qualifying Stage."  <u>Id.</u>  The Final Qualifying Stage, according to the website, will have a field size of 156 players plus ties from the Second Qualifying Stage sites.[6]  Barron contends that if he is not allowed

---

[6]At the hearing, Barron's counsel stated that he believed the top twenty-five finishers (including ties) from each site move on to the Final Qualifying Stage.  It appears to the court that it may actually be the top twenty-six finishers, although this discrepancy is irrelevant for purposes of deciding this motion.

to compete in the Second Qualifying Stage beginning November 18, 2009, he will be denied any opportunity to earn a spot at the Final Qualifying Stage.   Without the chance to compete at the Final Qualifying Stage, he could not earn a tour card, which would essentially preclude him from competing at PGA Tour events in 2010.

## II.   CONCLUSIONS OF LAW

As an initial matter, the PGA Tour argues that courts should decline to interfere with the internal decisions of a private association unless the association acts in an arbitrary and capricious manner.   While some courts have noted that courts are generally reluctant to interfere with internal decisions of private organizations, see Crouch v. NASCAR, Inc., 845 F.2d 397, 401 (2d Cir. 1988), there is "a distinction between, on the one hand, a simple challenge to an organization's allegedly erroneous interpretation and, on the other, an allegation that the organization acted in bad faith." M'Baye v. World Boxing Ass'n, 429 F. Supp. 2d 660, 667 (S.D.N.Y. 2006) (citing Crouch, 845 F.2d at 403).   "Put simply, a court should not intervene if it simply disagrees with what it perceives to be an unreasonable application of an organization's rules, but it may do so in response to legitimate allegations of bad faith or illegality." Id. at 667-68. Here, although Barron alleges that the actions of the PGA Tour were arbitrary, done in bad faith, and fundamentally unfair (Compl. ¶¶ 46-50, 64-69), he also alleges that the PGA Tour has acted in bad

-12-

faith and has violated federal and state laws in its application of the Program and imposition of sanctions against him.   Given the nature of the allegations, the court will proceed with addressing the merits of the motion.[7]

"Temporary restraining orders and preliminary injunctions are extraordinary remedies which should be granted only if the movant carries his burden of proving that the circumstances clearly demand it."  Ciavone v. McKee, No. 1:08cv771, 2009 WL 2096281, at *1 (W.D. Mich. July 10, 2009) (citing Overstreet v. Lexington-Fayette Urban County Gov't, 305 F.3d 566, 573 (6th Cir. 2002)); see also Jones v. Caruso, 569 F.3d 258, 265 (6th Cir. 2009); Leary v. Daeschner, 228 F.3d 729, 736 (6th Cir. 2000).   Under Federal Rule of Civil Procedure 65, the court must apply a four-factor test to determine

---

[7]The PGA Tour also argues in its memorandum of law that the court should decline to exercise jurisdiction over this case because Barron "failed to exhaust all of his available remedies."  However, Barron alleges in his complaint that it would have been futile to appeal the one-year sanction because, although under the Program an independent hearing officer would hear his appeal, that officer would submit a recommendation to the Commissioner, who could adopt or reject the recommendation.   Because under the Program the Commissioner makes the final decision on any appeal of a sanction, and given the alleged statement made by the Commissioner to Barron regarding the futility of filing an appeal and the possibility of receiving a harsher sanction, Barron argues that his decision not to appeal the sanction should not prevent him from having his case heard in court.   Although the court does not at this time make any finding regarding this allegation, it appears that Barron has presented sufficient evidence to support his contention that an appeal would have been futile.

whether to issue a temporary restraining order.[8]  The court must consider: (1) whether the party seeking the order has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.  Third Party Solutions, Inc. v. Express Scripts, Inc., 298 F. App'x 402, 403 (6th Cir. 2008) (citing Certified Restoration Dry Cleaning Network v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007)); Overstreet, 305 F.3d at 573; Leary, 228 F.3d at 736.  These factors "do not establish a rigid

---

[8]Rule 65 of the Federal Rules of Civil Procedure, under which Barron seeks injunctive relief, governs both temporary restraining orders and preliminary injunctions.  Although the motion before the court is styled a motion for a temporary restraining order, the motion is not *ex parte*, as the PGA Tour received notice of the motion and hearing.  In situations where, as here, the non-moving party has had an opportunity to respond and appear at a hearing, "[a] district court may treat a motion for a temporary restraining order as one for a preliminary injunction[.]" 5455 Clarkins Drive, Inc. v. Poole, No. 1:09-cv-01841, 2009 WL 2567761, at *2 (N.D. Ohio Aug. 17, 2009); see also Justice Res. Ctr. v. Louisville-Jefferson County Metro. Gov't, No. CIV A 07-209, 2007 WL 1302708, at *5 (W.D. Ky. Apr. 30, 2007).  However, given the timing of the filing of the complaint, the parties did not have an opportunity to present any witnesses and the hearing itself was, in large part, limited to arguments of counsel.  In any event, whether the court construes the present motion as one seeking a temporary restraining order or a preliminary injunction is of no real consequence, as the applicable legal standards are the same for both.  Poole, 2009 WL 2567761, at *2 ("'As long as there is notice to the other side and an opportunity to be heard, the standard for a preliminary injunction is the same as that for a temporary restraining order.'" (quoting Rios v. Blackwell, 345 F. Supp. 2d 833, 835 (N.D. Ohio 2004))).  To avoid confusion, the court will refer to the present motion as one seeking a temporary restraining order.

and comprehensive test for determining the appropriateness of preliminary injunctive relief," nor is any one factor controlling.[9] Frisch's Rest. Inc. v. Shoney's, Inc., 759 F.2d 1261, 1263 (6th Cir. 1984); see also Blackwell, 467 F.3d at 1009; Gonzales v. Nat'l Bd. of Med. Examiners, 225 F.3d 620, 625 (6th Cir. 2000).

**A.   Likelihood of Success on the Merits**

"In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." Six Clinics Holding Corp. II v. CAFCOMP Sys., 119 F.3d 393, 407 (6th Cir. 1997). "However, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair grounds for litigation and thus for more deliberative investigation." Id.

**1.   ADA Title III Discrimination Claim**

Barron's complaint and post-hearing memorandum of law allege that the PGA Tour has violated Title III of the ADA because it has

---

[9]At the hearing and in his post-hearing memorandum of law, Barron argued that "the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay," citing Northeast Ohio Coalition for the Homeless & Services Employees International Union, Local 1199 v. Blackwell, 467 F.3d 999 (6th Cir. 2006). Both Blackwell and the case its cites, Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog, 945 F.2d 150 (6th Cir. 1991), involved motions to stay on appeal, and "[b]ecause in considering a motion for an injunction pending appeal the court has already once decided against the movant's success on the merits, the balancing calculus is different." River Fields, Inc. v. Peters, No. 3:08-CV-264, 2009 WL 2406250, at *2 (W.D. Ky. Aug. 3, 2009). The court notes that its ultimate conclusion on the present motion would be the same even under the inverse proportionality approach.

discriminated against him on the basis of his disability - an abnormally low Testosterone level.[10]  "To prevail on a Title III discrimination claim, the plaintiff must show that (1) [the plaintiff] is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of [the plaintiff's] disability."  Molski v. M.J. Cable, Inc., 481 F.3d 724, 730 (9th Cir. 2007) (citing 42 U.S.C. § 12182(a)-(b); Mershon v. St. Louis Univ., 442 F.3d 1069, 1077 (8th Cir. 2006); Parr v. L & L Drive-Inn Rest., 96 F. Supp. 2d 1065, 1085 (D. Haw. 2000); Dunlap v. Ass'n of Bay Area Gov'ts, 996 F. Supp. 962, 965 (N.D. Cal. 1998)); Day v. Sumner Reg'l Health Sys., Inc., No. 3:07-0595, 2007 WL 4570810, at *2 (M.D. Tenn. Dec. 26, 2007).

"An individual is considered 'disabled' under the ADA if [the individual] (1) 'has a physical or mental impairment that substantially limits one or more of the major life activities of such individual,' (2) 'has a record of such impairment,' or (3) is

_____

[10]Barron makes no ADA claim based on his treatment for mitral valve prolapse or his use of Propranolol.  In addition, he makes no claim under Title I or Title II of the ADA.  See PGA Tour, Inc. v. Martin, 532 U.S. 661, 678 (2001) (stating that professional golfer's ADA claim could not be brought under Title I because that Title applies to employees, not independent contractors such as professional golfers).

regarded . . . as having such an impairment."[11] <u>Gruener v. Ohio Cas. Ins. Co.</u>, 510 F.3d 661, 664 (6th Cir. 2008) (quoting <u>Sullivan v. River Valley Sch. Dist.</u>, 197 F.3d 804, 810 (6th Cir. 1999)); <u>see also</u> 42 U.S.C. § 12102(1). According to the ADA regulations, an impairment is "substantially limiting" if it renders an individual unable to perform a major life activity that the average person in the general population can perform, or if it significantly restricts the condition, manner or duration under which an individual can perform such an activity compared to the general population. <u>Talley v. Family Dollar Stores of Ohio, Inc.</u>, 542 F.3d 1099, 1107 (6th Cir. 2008); <u>Cooper v. Olin Corp., Winchester Div.</u>, 246 F.3d 1083, 1088 (8th Cir. 2001).

In this case, Barron argues that he qualifies as being "disabled" under the ADA because he has a physical impairment (abnormally low Testosterone) that substantially limits a major

---

[11]Effective January 1, 2009, the ADA Amendments Act of 2008 made a number of important changes to the definition of the term "disability" by rejecting the rulings of several Supreme Court decisions and portions of the Equal Employment Opportunity Commission's ADA regulations. The parties, however, have not argued that the Amendments Act has any impact on the issues relevant to Barron's ADA claim. Moreover, the courts have declined to apply this Act retroactively, viewing the statute as altering the parties' duties and liabilities under the prior version of the ADA. <u>See</u> <u>Milholland v. Sumner County Bd. of Educ.</u>, 569 F.3d 562, 566-67 (6th Cir. 2009); <u>see also</u> <u>Barnes v. GE Sec., Inc.</u>, 2009 WL 1974770, at *1 (9th Cir. June 18, 2009); <u>Fikes v. Wal-Mart, Inc.</u>, 2009 WL 961774, at *1 n.1 (11th Cir. Apr. 10, 2009); <u>EEOC v. Argo Distribution, L.L.C.</u>, 555 F.3d 462, 469 n.8 (5th Cir. 2009); <u>Kiesewetter v. Caterpillar, Inc.</u>, 295 F. App'x 850, 851 (7th Cir. 2008).

life activity (engaging in sexual relations). "The Sixth Circuit has not yet found that engaging in sexual activities is a major life activity." Marziale v. BP Prods. N.A., Inc., No. 1:05cv741, 2007 WL 4224367, at *7 (S.D. Ohio Nov. 27, 2007) (citing Hayes v. United Parcel Serv., Inc., No. 00-5296, 2001 WL 1006162, at *2 (6th Cir. Aug. 20, 2001)). However, the Supreme Court has found that sexual reproduction is a major life activity, see Bragdon v. Abbot, 524 U.S. 624, 638-39 (1998), and the majority of cases from other circuits have concluded that "engaging in sexual relations, just like procreation, is a major life activity." McAlindin v. County of San Diego, 192 F.3d 1226, 1234 (9th Cir. 1999); see also Sussle v. Sirina Prot. Sys. Corp., 269 F. Supp. 2d 285, 298-99 (S.D.N.Y. 2003) (citing cases and finding that engaging in sexual relations is a major life activity).

In addition to sexual relations, Barron also claims that his low Testosterone causes fatigue and compromises his immune system. "Since fatigue in and of itself does not constitute an 'activity,' suffering from fatigue cannot qualify as a major life activity." Sussle, 269 F. Supp. 2d at 300. A major bodily function, on the other hand, including functions of the immune system, is considered a major life activity. 42 U.S.C. § 12102(2)(B). According to Barron's complaint, "low Testosterone can prevent the body from healing at a normal rate and can further compromise a man's immune system, placing him at a higher risk of infection and illness," and

-18-

Barron "experienced all of these symptoms." (Compl. ¶ 13.) Given the procedural posture of this case, the court has not received any proof, such as medical records or testimony from Barron's physicians, to further support these claims. However, Barron's complaint asserts that in 2005 his Testosterone level tested at 78, he has been taking monthly Testosterone shots since then, he applied for the TUE based on this condition as soon as the PGA Tour's Program went into effect and submitted to independent medical examinations, and the PGA Tour's medical examinations in late 2008 showed that he had levels that fell on the lower end of the normal range. Based on the limited record and the above case law, this court finds that Barron has shown a fairly strong likelihood of success on his claim that he is disabled under the ADA.

With respect to the second requirement of a Title III discrimination claim – that the PGA Tour is a private entity that owns, leases, or operates a place of public accommodation – the Supreme Court ruled in <u>PGA Tour, Inc. v. Martin</u>, 532 U.S. 661 (2001), that Title III of the ADA, by its plain terms, prohibits the PGA Tour from denying players equal access to its events on the basis of their disabilities. <u>Id.</u> at 677. As the Court stated, "[i]t seems apparent, from both the general rule and the comprehensive definition of 'public accommodation,' that petitioner's golf tours and their qualifying rounds fit comfortably

-19-

within the coverage of Title III[.]" Id.  Thus, Barron has shown

a strong likelihood of success on this second requirement of the

Title III analysis.

     With respect to the third requirement, however, the court

finds that Barron has not shown a likelihood of success on the

merits.  Title III defines discrimination as

> a failure to make reasonable modifications in policies,
> practices, or procedures, *when such modifications are*
> *necessary* to afford such goods, services, facilities,
> privileges, advantages, or accommodations to individuals
> with disabilities, unless the entity can demonstrate that
> making such modifications would fundamentally alter the
> nature of such goods, services, facilities, privileges,
> advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii) (emphasis added).  In Martin, the

Supreme Court explained that

> [the PGA Tour] does not contest that a golf cart is a
> reasonable modification that is necessary if Martin is to
> play in its tournaments.  Martin's claim thus differs
> from one that might be asserted by players with less
> serious afflictions that make walking the course
> uncomfortable or difficult, but not beyond their
> capacity.  In such cases, an accommodation might be
> reasonable *but not necessary*.

532 U.S. at 682 (emphasis added); see also Logan v. Am. Contract

Bridge League, 173 F. App'x 113, 117 (3d Cir. 2006) (citing Martin

and stating that "Logan admits that the Logan Deck is not *necessary*

to give him access to ACBL competitive bridge; he merely claims

that without it, he 'can't play to the maximum of [his] potential.'

. . . Logan has failed to set forth a meritorious claim"); Murphy

v. Bridger Bowl, 150 F. App'x 661, 663 (9th Cir. 2005) (citing

-20-

<u>Martin</u> and stating that appellant's claim failed "because she presented insufficient evidence to show that her requested accommodation is necessary," because under Title III, "a place of public accommodation need not make a reasonable modification unless it is necessary to provide an individual with a disability full and equal enjoyment of its goods, services, facilities, privileges, advantages, or accommodations").

Here, Barron has not shown that the "reasonable accommodation" he has requested (allowing him to continue taking exogenous Testosterone) is necessary in order for him to continue playing golf in PGA Tour events. His complaint and post-hearing brief, at most, claim that he needs these Testosterone shots to address specific medical concerns relating to a reduced sex drive, fatigue, and a compromised immune system – not to play golf. While Barron's abnormally low Testosterone may in some way cause him to be a less competitive golfer than he would be if he were permitted to take the Testosterone injections, Title III simply does not provide a remedy under those circumstances.[12]   Therefore, the court concludes that Barron has not shown a likelihood of success on the merits of

---

[12]To the extent Barron claims that his low Testosterone causes fatigue, which this court addressed above in the disability analysis, the Supreme Court in <u>Martin</u> explained that "fatigue from walking during one of [the PGA Tour's] 4-day tournaments cannot be deemed significant" and "because golf is a low intensity activity, fatigue from the game is primarily a psychological phenomenon in which stress and motivation are the key ingredients." <u>Martin</u>, 532 U.S. at 687.

his ADA claim.

2. <u>State Law Claims</u>

Barron alleges in his complaint that the PGA Tour's Program is an unconscionable contract and therefore is void; that the PGA Tour has breached its duty of good faith and fair dealing by applying the TUE provisions and imposing the sanction against him in an arbitrary and capricious manner; that by issuing a press release that was misleading, the PGA Tour defamed him and placed him in a false light; and that the PGA Tour tortiously interfered with his prospective business endorsement opportunities.  For purposes of this section, the court need not address the likelihood of success of Barron's claims regarding defamation and false light, as these claims relate to events that occurred after the PGA Tour imposed the sanctions against Barron and are not relevant to the injunctive relief sought in the present motion.

Barron's argument that the Program is an unconscionable contract under Tennessee law and his tortious interference claim appear to be without merit.  First, it is unclear whether unconscionability, which is a defense to the enforcement of a contract, can even be pleaded as a separate cause of action.  <u>Wallace v. Nat'l Bank of Commerce</u>, 938 S.W.2d 684, 688 (Tenn. 1996).  Assuming, *arguendo*, that unconscionability could be construed as a cause of action, "[a]n unconscionable contract is one in which the provisions are so one-sided, in view of all the

facts and circumstances, that the contracting party is denied an opportunity for meaningful choice." Vintage Health Res., Inc. v. Guiangan, No. W2008-COA-R3-CV, 2009 WL 2601327, at *7 (Tenn. Ct. App. Aug. 25, 2009) (quoting Taylor v. Butler, 142 S.W.3d 277, 285 (Tenn. 2004)). "The Tennessee Supreme Court has described substantive unconscionability as existing when the 'inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other.'" Id. (quoting Taylor, 142 S.W.3d at 285). Here, the court cannot find anything in the record to suggest that the terms and provisions of the Program at issue in this case are so one-sided that Barron was denied an opportunity for meaningful choice, or that the terms are oppressive or shock the judgment of a person of common sense. The Program was developed in conjunction with the major golf tours, incorporated input from leading experts in the field of anti-doping, and was modeled after the World Anti-Doping Code, the "gold standard" for anti-doping programs that has been widely adopted by sports organizations throughout the world. (Levinson Decl. ¶¶ 5-6.)

Second, with respect to the tortious interference with business relationships claim, there are five elements:

(1) an existing business relationship with specific third parties or a prospective relationship with an

-23-

identifiable class of third persons; (2) the defendant's
knowledge of that relationship and not a mere awareness
of the plaintiff's business dealings with others in
general; (3) the defendant's intent to cause the breach
or termination of the business relationship; (4) the
defendant's improper motive or improper means; and
finally, (5) damages resulting from the tortious
interference.

Trau-Med of Am., Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 701
(Tenn. 2002). "[W]ith regard to improper motive, we require that
the plaintiff demonstrate that the defendant's predominant purpose
was to injure the plaintiff." Id. at 701 n.5. There is no
evidence in the record to remotely suggest that the "predominate
purpose" of the PGA Tour's actions was to injure him or that it
intended to cause the breach or termination of his business
relationships. Therefore, the court finds that Barron has not
shown a likelihood of success on the merits of these two claims.

3.   Arbitrary/Bad Faith/Fundamental Unfairness Claim

Barron's remaining claim is that the PGA Tour's decision to
deny his two requests for TUEs and to impose the one-year sanction
was arbitrary, done in bad faith, and fundamentally unfair.
(Compl. ¶¶ 46-50, 64-69.) As briefly discussed above, "courts are
generally reluctant to interfere in the internal affairs of private
organizations and clubs." Robertson v. Tenn. Walking Horse
Breeders' & Exhibitors' Ass'n, No. 01A01-9610-CV-00456, 1998 WL
382192, at *3 (Tenn. Ct. App. July 10, 1998) (citing Original
Lawrence County Farm Org., Inc. v. Tenn. Farm Bureau Fed'n, 907
S.W.2d 419, 421 (Tenn. Ct. App. 1995); Moran v. Vincent, 588 S.W.2d

-24-

867, 870 (Tenn. Ct. App. 1979)); <u>Flowers v. Metro. Baptist Sch.</u>,
No. 01-A-01-9705-CH00219, 1997 WL 330644, at *1 (Tenn. Ct. App.
June 18, 1997) (reversing trial court's decision enjoining private
school from expelling student accused of smoking marijuana; "courts
should not interfere in the internal affairs of private, voluntary
organizations unless there is a showing that the organization's
procedures have not been followed or that the organization has
otherwise acted in an arbitrary, oppressive or unlawful manner");
<u>see also</u> <u>Schulz v. U.S. Boxing Ass'n</u>, 105 F.3d 127, 133 (3d Cir.
1997) (affirming order granting preliminary injunction and
explaining that judicial intervention into the affairs of private
organizations is appropriate if plaintiff has interest sufficient
to warrant judicial action and that interest has been subjected to
an unjustifiable interference by defendant); <u>Rose v. Giamatti</u>, No.
A8905178, 1989 WL 111445, at *2 (Ohio C.P. Hamilton County June 23,
1989) ("'The decisions of any kind of a voluntary society or
association in disciplining or suspending, or expelling members are
of a quasi judicial character.  In such cases, the courts never
interfere except to ascertain whether or not the proceeding was
pursuant to the rules and laws of the society, whether or not the
proceeding was in good faith, and whether or not there was anything
in the proceeding in violation of the laws of the land.'" (quoting
<u>State ex rel. Ohio High Sch. Athletic Ass'n v. Judges</u>, 181 N.E.2d
261, 266 (1962)) (emphasis omitted)).  "When a member has been

expelled, suspended, or excluded from membership for cause, a court should look no further than necessary to establish that the procedure involved was fair and reasonable." Robertson, 1998 WL 382192, at *3 (citing Tenn. Code Ann. § 48-56-302 (1995); Original Lawrence County Farm Org., 907 S.W.2d at 422).

With respect to Barron's use of Propranolol, the court finds that based on the preliminary and limited record, he has met his burden of showing a strong likelihood of success that the decision to impose the sanction was unfair and unreasonable. Barron was diagnosed with mitral valve prolapse in 1987 and was prescribed a beta blocker by his treating physicians. His June 23, 2008 application for a TUE to use Propranolol was denied by the PGA Tour TUE Committee, and he was instructed to wean off of the medication. According to his complaint, Barron then proceeded to wean off the medication under the "strict supervision" of a medical doctor. By June of 2009, he had gone from taking 160 milligrams of the medication to 40 milligrams and was following his doctor's instructions in an effort to get off the medication. Barron further avers in his complaint that he did not receive any instruction from the PGA Tour's panel of doctors as to how they wanted him to wean off the medication. Although Barron's submission of additional information on July 23 and August 12, 2009 apparently did not convince the PGA Tour's TUE Committee that his use of Propranolol was justified, the court is satisfied that

Barron has met his burden of "rais[ing] questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair grounds for litigation and thus for more deliberative investigation." Six Clinics Holding Corp. II, 119 F.3d at 407.

According to Commissioner Finchem, however, the one-year suspension sanction would have been imposed even if Barron tested positive only for exogenous Testosterone.  As stated in the Commissioner's October 20, 2009 letter to Barron, "[a]lthough your violation involved the use of two Prohibited Substances, under the circumstances of this case, your sanction would have been the same had your sample contained either one of these Prohibited Substances alone." (11/13/09 hearing, Ex. 2. at 2.)  Thus, even if Barron is eventually able to prevail on the merits of his Propranolol claim, the sanction could nevertheless be upheld if he does not prevail on his Testosterone claim.

Barron avers that he was diagnosed as having an abnormally low Testosterone level in 2005, specifically, "his level was 78 and normal ranges begin at 200." (Compl. at 2.)  To address this condition, he began receiving Testosterone injections from his physicians on a monthly basis; however, his physicians never attempted to get his Testosterone levels above the normal range and did not give him the Testosterone injections to enhance his golf performance.  According to Barron, "[t]he opinion of Plaintiff's physicians on this issue is supported by Plaintiff's 170 pound

frame before he was ever given the injections and his 170 pound
frame today, together with the results of his play before the
injections and after the injections." (Id. at 3.)

On June 23, 2008, Barron submitted his TUE application to the
PGA Tour to allow him to continue taking the exogenous
Testosterone. The TUE Committee that reviewed his application was
comprised of doctors, including endocrinologists. The TUE
Committee requested that Barron be re-examined by an independent
endocrinologist, who directed Barron to stop using Testosterone so
that his normal Testosterone levels could be evaluated. In
November and December of 2008, the endocrinologist took samples of
Barron's blood. The November test indicated Barron's Testosterone
level was 325 and the December test indicated that it was 296.
Barron does not dispute the accuracy of these tests, nor does he
dispute that these levels fall within the normal Testosterone
range.[13]  The TUE Committee denied his application to use
Testosterone on January 21, 2009, and Barron did not appeal this
decision.

Barron was scheduled to play in the St. Jude Classic golf
tournament, which began on June 8, 2009. Barron admits that
sometime during the week before the start of the tournament, he

---

[13]As expressly stated in Section 2(F) of the Program, "the use of
any *Prohibited Substance* or *Prohibited Method* to increase 'low-
normal' levels of any Endogenous hormone is not considered an
acceptable therapeutic intervention[.]"

went to his doctor and received a single shot of Testosterone. From the timing of this injection, the court can only assume that he took this injection to prepare for the tournament. Even though Barron knew he was prohibited from using Testosterone, he signed a tournament application form confirming his understanding that he was required to abide by the Program and did not voluntarily disclose his use of the exogenous Testosterone. It was only after he tested positive on June 11, 2009, that he admitted to using it. Following the positive test, the PGA Tour gave Barron an opportunity to submit additional information regarding his use of Testosterone (and Propanolol). Barron provided additional medical information to the Committee on July 23, 2009 and August 12, 2009, and the Committee reviewed the additional information and found it insufficient to justify a TUE for the banned substances.

Barron has not alleged in his complaint, or provided the court with medical evidence to show, that the blood tests conducted by the independent endocrinologist were inaccurate or that his Testosterone levels dropped below the normal range between January and June of 2009. Had his levels dropped during this period, Barron could have reapplied for a TUE before the St. Jude Classic, which is permitted under the Program, but did not do so. The court has not been provided with the additional information that the TUE Committee received from Barron after he tested positive in June; however, Barron has not claimed that the additional information

would reveal that he had abnormally low Testosterone levels between January and June of 2009.

As for the sanction itself, it was imposed by Commissioner Finchem based on Barron's intentional and continued use of Testosterone. In his October 20 letter, the Commissioner outlined the bases for his decision, the terms of the sanction, and Barron's right to appeal the decision. The Program authorizes the Commissioner to impose a one-year suspension for this violation, a sanction that also appears to be consistent with the World Anti-Doping Code. The Commissioner even took into consideration Barron's desire to compete in the 2010 Q-School, and therefore decided to make the suspension retroactive to September 20, 2009, so that Barron could participate in the 2010 Q-School. Based on this record, the court finds that Barron has not shown a likelihood of success that the one-year sanction imposed for his use of Testosterone was arbitrary, unreasonable, or unfair.[14]

---

[14]Barron also makes a reference in his complaint that he believes other golfers may have tested positive for marijuana, but that they were not similarly suspended from the tour. Section 2(K)(4) of the Program provides that "[s]anctions for Drugs of Abuse shall include a PGA TOUR-approved plan of treatment and rehabilitation to be conducted at the player's expense, in addition to *or in lieu of ineligibility and fine*." (emphasis added). Even assuming, *arguendo*, that the Commissioner has sanctioned golfers who have tested positive for drugs of abuse (such as marijuana) by directing them to go through treatment as opposed to suspending them, Barron has not shown that the Program's sanctions imposed against users of drugs of abuse as compared to other banned substances (such as steroids) are so arbitrary or unfair that a court should overturn his sanction.

**B.   Irreparable Harm to Barron**

The court finds that Barron has made a strong showing of irreparable harm.[15] If the restraining order is not issued, Barron would be prohibited from playing in the Second Qualifying Stage of the Q-School tournament.  Without the chance to compete, he cannot qualify for the Final Qualifying Stage in December, which would mean that he would not be able to earn a tour card and therefore could not compete at any PGA Tour events in 2010.  Thus, even if he eventually prevails at trial, by denying his motion for a temporary restraining order, the court would, in effect, prevent him from competing at PGA Tour events next year.[16] In addition, without the ability to compete next year, Barron may encounter difficulties at

---

[15]Barron argues in his post-hearing memorandum of law that "[i]t is well established that if the party seeking the temporary restraining order can establish the last three factors listed above, then the first element (likelihood of prevailing on the merits) becomes more lenient," citing Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1246 (10th Cir. 2001).  Pierce is a decision from another circuit, and therefore is not binding on this court.  Moreover, based on the court's own research of the federal cases nationwide, the court could not find any cases from either the Sixth Circuit Court of Appeals, or for that matter any other circuit, that apply the four-factor test in the same manner as the Tenth Circuit.

[16]PGA Tour suggested at the hearing that if Barron were to prevail at trial and his suspension was lifted, he could still compete in PGA Tour events on a sponsor exemption.  These exemptions, as the court understands, are difficult to obtain.  Barron, for example, received only one sponsor exemption in 2009, and that was for the St. Jude Classic.

trial proving his damages.[17]  <u>United States v. Miami Univ.</u>, 294 F.3d 797, 819 (6th Cir. 2002) ("'[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate.'" (quoting <u>Basicomputer Corp. v. Scott</u>, 973 F.2d 507, 511 (6th Cir. 1992))).

## C.   Public Interest and Balancing the Harms

Finally, the court must consider whether issuing the temporary restraining order will cause "substantial harm to others," and the court must consider the public interest.  <u>Leary</u>, 228 F.3d at 736; <u>Int'l Mgmt. Sec. Group, Inc. v. Sawyer</u>, No. 3:06cv0456, 2006 WL 1638537, at *8 (M.D. Tenn. June 6, 2006).  Barron argues that the court should grant his motion because if the restraining order is issued, there will be no harm to the PGA Tour or the public.  The court disagrees.  If the restraining order is issued, and Barron is allowed to play at the Second Qualifying Stage, he would be competing with other golfers who, like Barron, want very much to earn a tour card for next year.  If Barron finishes among the top twenty-six players, which of course is what he hopes to do, then depending on how the other players perform, his participation could result in one or possibly more players (depending on ties) missing their chance at moving on to the Final Qualifying Stage and earning

---

[17]Although it is difficult this early in the litigation to predict what damages the court may or may not allow Barron to prove at trial, Barron might be permitted to use his past tournament earnings and endorsements as support for his claim of lost earnings.

a tour card.  If Barron does not prevail at trial, these other players – who have presumably abided by the Program's rules – would have been denied the chance to compete in PGA Tour events in 2010. Moreover, if Barron is permitted to play in the Second Qualifying Stage, it could raise substantial public policy concerns regarding the enforcement of anti-doping policies in professional sports. Specifically, the requested injunction could raise doubts in the minds of professional golfers and golf fans regarding the PGA Tour's ability to fairly and effectively administer and enforce its Anti-Doping Program.

### III. CONCLUSION

In sum, the court finds that Barron has not shown a likelihood of success on the merits of his claims, but has made a strong showing of irreparable harm.  The harm to others and the public interest concerns weigh in favor of denying the restraining order. The court is mindful that a temporary restraining order is an "extraordinary remedy" which should be granted only if the movant carries his burden of proving that the circumstances clearly demand it.  Although a close case, the court concludes that, based on the record before the court and the standards under Rule 65, Barron has not demonstrated that a restraining order is warranted in this case.  Therefore, the motion is denied.

IT IS SO ORDERED.

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

November 16, 2009
Date

-33-